UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LORRIE WILKERSON

                Plaintiff,                CIVIL ACTION NO. 05-CV-70229-DT

        vs.                       DISTRICT JUDGE SEAN F. COX

COMMISSIONER OF              MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/

REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION**

This Court recommends that Defendant's Motion for Summary Judgment be **GRANTED** (Docket # 22), that Plaintiff's Motion for Summary Judgment be **DENIED** (Docket # 19), and that Plaintiff's complaint be **DISMISSED.**

**II.**    **PROCEDURAL HISTORY**

This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

Plaintiff Lorrie Wilkerson filed an application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) in November 2001. (Tr. 51-53, 103, 470-72). She alleged

she had been disabled since November 10, 2001 due to depression and medicinal side effects. *Id*. Plaintiff's claims were denied upon initial review. (Tr. 35-40, 473-77). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 41-42, 478). A hearing took place before ALJ Basil L. Blair on December 17, 2003. (Tr. 499-525). Plaintiff was represented at the hearing. (Tr. 33-34). The ALJ denied Plaintiff's claims in an opinion issued December 24, 2003. (Tr. 19-30). The Appeals Council denied review of the ALJ's decision on November 17, 2004 and the ALJ's decision is now the final decision of the Commissioner. (Tr. 1-17, 496-98). Plaintiff appealed the denial of her claims to this Court, and both parties have filed motions for summary judgment.

## III.  MEDICAL HISTORY[1]

Plaintiff was examined by Dr. Katherine Chamberlain in December 2001. Dr. Chamberlain reported that Plaintiff had previously been on Paxil for almost six years maintaining stability until she decided to cut-back on the medication. Plaintiff compensated with symptoms of significant anxiety and depression related to traumatic childhood events. (Tr. 264). Dr. Chamberlain also noted that Plaintiff had attempted suicide three times in the past two months and she had been hospitalized on four occasions in the past two months. (Tr. 170-255, 264). At the time, Plaintiff was working one day a week at a grocery store and attending college full time. Plaintiff stated that she could not work due to her mental instability,

---

[1]     Plaintiff challenges the ALJ's findings that pertain to Plaintiff's mental impairments. Therefore, only the medical records relevant to these impairments are discussed herein.

particularly anxiety and difficulties with her concentration and memory. (Tr. 264, 266). Dr. Chamberlain diagnosed Plaintiff with major depressive disorder, rule out post-traumatic stress disorder, and personality disorder and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 55. (Tr. 267). Dr. Chamberlain also prescribed Paxil and noted that she would wean Plaintiff off of Serazone and Neurontin. (Tr. 262, 267). Plaintiff was hospitalized the next month when Plaintiff reported feeling suicidal. She had felt overwhelmed and was having flashbacks. (Tr. 260). Dr. Chamberlain thereafter made some changes to Plaintiff's medication. *Id.*

In February 2002, Plaintiff was again admitted to the hospital after she overdosed on prescription medication.[2] (Tr. 144-58). Plaintiff was discharged after three days with instructions to follow-up with her therapist. (Tr. 145). The discharge summary indicates that malingering needed to be ruled out and that Plaintiff may have had secondary gain motivation arising from her disability claim. *Id.* Plaintiff's GAF score at the time of discharge was 70.

Plaintiff continued her monthly sessions with Dr. Chamberlain and her weekly sessions with a therapist throughout 2002 and 2003. (Tr. 270-469). It was generally noted that Plaintiff would be on-time, appropriately groomed, and alert and oriented. Her moods would fluctuate often in response to changes or problems in the relationships in her life. Dr. Chamberlain noted

---

[2]     The records indicate that Plaintiff missed an appointment with a state examiner while she was hospitalized for this suicide attempt. (Tr. 84).

-3-

in March 2003 that Plaintiff was "doing pretty well" and by April 2003 Plaintiff stated that she

was a "bit brighter and doing a little better." (Tr. 376, 378).

Dr. Chamberlain filled out a form at the request of Plaintiff's representative regarding

Plaintiff's functional limitations. (Tr. 466-69). Dr. Chamberlain stated that Plaintiff did not

have any restrictions of activities of daily living. Plaintiff also had moderate difficulties in

maintaining social functioning, often had deficiencies of concentration, persistence, or pace

resulting in a failure to complete tasks in a timely manner, and repeated (three or more) episodes

of deterioration or decompensation in work or work-like settings. (Tr. 466). Dr. Chamberlain

assigned Plaintiff a GAF score of 60.

Dr. Chamberlain also concluded that Plaintiff had good ability to follow work rules and

understand, remember, and carry out simple job instructions. Plaintiff also had a fair ability to:

(1) relate to co-workers; (2) deal with the public; (3) interact with supervisors; (4) function

independently; (5) persist at work-like tasks; (6) understand, remember, and carry out detailed,

but not complex, job instructions; (7) maintain personal appearance; (8) behave in an

emotionally stable manner; (9) relate predictably in social situations; and (10) demonstrate

reliability. However, Dr. Chamberlain believed that Plaintiff had a poor ability to use judgment,

deal with work stresses, maintain attention and concentration, and understand, remember, and

carry out complex job instructions.[3] (Tr. 467-68).

---

[3]     The form defined "good" as no limitations, "fair" as limited but satisfactory,
and "poor" as seriously limited but not precluded.

-4-

Dr. L.J. McCulloch, a psychologist, performed a consultative examination of Plaintiff. Plaintiff reported to Dr. McColloch that she lived alone with her four cats, was on good terms with her family, and had some friends. (Tr. 139). She also stated that although she had problems sleeping, her sleep had improved with her medication. (Tr. 138-39). Plaintiff would also try to clean her house, sit outside in the sun, and clean out the garden although she was not always motivated to do so. (Tr. 139). She also did her own shopping, laundry, cooking, and driving. *Id.*

Plaintiff was on time for her appointment and well-groomed, had good contact with reality, and her thoughts were organized, spontaneous, and logical. Her affect was restricted. (Tr. 140). Plaintiff was able to repeat 6 numbers forward and 4 numbers backward, could not recall any objects after three minutes, and could name some past presidents. (Tr. 141). She could perform calculations and appropriately responded to questions regarding judgment, abstract thinking, and the similarities/differences between objects. (Tr. 141-42). Dr. McCulloch diagnosed Plaintiff with major depressive disorder and a history of borderline personality disorder and assigned Plaintiff a GAF score of 50.

Plaintiff's medical records were also reviewed by Dr. Askhok Kaul, a psychiatrist. (Tr. 118-136). Dr. Kaul concluded that Plaintiff had an affective disorder and a substance addiction disorder. (Tr. 121, 126). He determined that Plaintiff's impairments resulted in mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning and in

maintaining concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  (Tr. 128).

Dr. Kaul also completed a mental Residual Functional Capacity ("RFC") assessment form indicating that Plaintiff was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) interact appropriately with the general public; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) respond appropriately to changes in the work setting.  (Tr. 132-33).  In summary, Dr. Kaul opined that Plaintiff was capable of performing unskilled work.  (Tr. 134, 136).

## IV.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was 45 years old when she appeared before the ALJ.  (Tr. 504).  She had a high school education and had completed two years of college.  *Id.*  Plaintiff testified that she had problems with depression in the past but that she had been on medication, which enabled her to work.  Her recent onset of depression started around October 2001 and was more extreme.  (Tr. 506).  If her depression got out of control, she became suicidal.  (Tr. 510).  Plaintiff also testified that there were days that the depression made it difficult to get up and dress.  *Id.*  Her mental condition had also impaired her short-term memory.  (Tr. 512).  Plaintiff testified that she drove but some days she would not drive if she was not thinking clearly.  (Tr. 513).  Plaintiff's treating mental-healthy physician was Dr. Chamberlain and

-6-

her medications for her mental condition included Serzone, Celexa, and Restoril.  (Tr. 507).

The Restoril made it difficult for Plaintiff to wake up in the morning and her other

medications made her groggy.  (Tr. 509, 512).  Plaintiff saw a therapist every week since her

most recent hospitalizations.  (Tr. 511-12).  She also attended a class every week to learn new

ways to cope with her depression.  (Tr. 507).

Plaintiff testified that she prepared her own meals, consisting of TV dinners.  She also

did the laundry, vacuumed albeit rarely, and tended to some yard work that did not require

vibrating machinery.  (Tr. 508).  Plaintiff's hobbies included learning computer programs,

reading, and interacting with her grandchildren.  *Id.*  She was also a member of a church and

would visit with friends and relatives.  *Id.*  On a typical day, Plaintiff would awake, smoke a

cigarette, and feed her cats.  If she was not in too much pain, she would then get dressed, go

to the store in her community, drink a cup of coffee with friends, and return home to try to

do some housework or laundry.  If possible, Plaintiff would later visit with a friend.  (Tr.

509).

When asked about her limitations, Plaintiff estimated that she could: (1) lift a gallon

of milk on a good day; (2) stand for about 10 minutes; (3) walk a block or two; and (4) sit for

5 to 10 minutes.

**B.   Medical Expert Testimony**

Dr. Robert Brooks, a medical expert, testified that Plaintiff had severe mental

impairments, including an affective disorder (major depression), an anxiety-related disorder

(PTSD), and a history of substance addiction disorder. (Tr. 515). Dr. Brooks concluded that based upon the medical evidence Plaintiff had slight restrictions of activities of daily living, moderate difficulties in maintaining social functioning, slightly better than moderate difficulties in maintaining concentration, and repeated episodes of decompensation. (Tr. 519). Dr. Brooks also opined that Plaintiff's mental impairments did not meet or equal the requirements of any listed impairment. *Id.*

### C. <u>Vocational Expert's Testimony</u>

Ms. Heather Benton, a rehabilitation counselor, testified as a vocational expert at the hearing. (Tr. 519-25). The ALJ asked Ms. Benton what jobs would be available in Michigan's lower peninsula for a hypothetical individual of Plaintiff's age, education, and work history who was able to perform light work that: (1) did not require the use of vibrating tools; (2) only had duties involving one, two, or three step instructions; (3) involved only unskilled, simple work; (4) did not require individual to read, calculate, compute, problem solve, or reason; (5) entailed minimum contact and directions from supervisors; (6) did not require more than change and adaptation once per month; and (7) provided only superficial contact with the general public. (Tr. 523-24). Ms. Benton testified that such an individual could perform several unskilled, light jobs, including 6,500 inspector positions and 3,000 assembler positions. (Tr. 524).

V.      LAW AND ANALYSIS

   A.      STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's

decisions.  Judicial review of those decisions is limited to determining whether her findings are

supported by substantial evidence and whether she employed the proper legal standards.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir.

1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).

It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or

decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679,

681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the

Court must examine the administrative record as a whole.  *Kirk v. Sec'y of Health and Human*

*Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).   If the

Commissioner's decision is supported by substantial evidence, it must be affirmed, even where

substantial evidence also supports the opposite conclusion and the reviewing court would decide

the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

### B.    FRAMEWORK OF SOCIAL SECURITY DISABILITY DETERMINATIONS

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)    he was not presently engaged in substantial gainful employment; and

(2)    he suffered from a severe impairment; and

(3)    the impairment met or was medically equal to a "listed impairment;" or

(4)    he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled.  20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs."  *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'"  *Id.* (citations omitted).

-10-

C.   __ARGUMENT__

Plaintiff alleges that the ALJ's RFC finding is not supported by substantial evidence. Plaintiff's takes issue with the ALJ's isolated statement that "[t]he medical evidence does not demonstrate any debilitating complications for claimant's alleged impairments." (Tr. 26). She then points out that the existence of her mental impairments was substantiated by observations made by her treating mental health professionals. The import of this fact is not clear because the ALJ actually found that Plaintiff had severe mental impairments. Specifically, the ALJ found that Plaintiff had severe impairments consisting of major depressive disorder, PTSD, and alcohol abuse in remission. (Tr. 25).

Plaintiff further asserts that the ALJ only gave "lip service" to the criteria set forth in 20 C.F.R. § 404.1529 in assessing Plaintiff's credibility and that in doing so the ALJ mis-characterized the evidence. An ALJ's findings regarding the credibility of the applicant "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). However, credibility assessments are not insulated from judicial review. Despite the deference due, such a determination must nevertheless be supported by substantial evidence. *Id.*

The regulations also provide that a claimant's statements regarding her "pain or other symptoms will not alone establish that [she is] disabled[.]" 20 C.F.R. § 404.1529(a); *see also Walters, supra*, 127 F.3d at 531. Rather, "there must be medical signs and laboratory findings

-11-

which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence...would lead to a conclusion that you are disabled." 20 C.F.R. § 404.1529(a).  An ALJ evaluates the intensity and persistence of a plaintiff's symptoms under 20 C.F.R. § 404.1529(c).  In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living.  *Id.*

The ALJ considered Plaintiff's treatment history as a whole.  He noted that although Plaintiff had several hospitalizations in the past, her last hospitalization occurred two and half years prior to his decision in early February 2002.[4]  Plaintiff's GAF score at the time of her release was 70.  Thereafter, Plaintiff began treatment with a therapist on a weekly basis and with Dr. Chamberlain on a monthly basis.  Plaintiff was also placed on medication.  The treatment notes reflect that Plaintiff was able to maintain stability while this treatment was in place.[5]  As

---

[4]       As noted by the ALJ, there was a question as to whether Plaintiff was malingering during her most recent hospitalization.  (Tr. 24, 145).

[5]       Plaintiff asserts that ALJ overlooked her weekly course in learning skills to deal with her depression and that someone who was mentally fit would not need to attend therapy twice a week.  In her reply brief, Plaintiff also notes that she was not "cured" simply because she was no longer hospitalized.  There is no requirement, however, that Plaintiff be cured or freed from all mental impairments in order for a finding of non-disability to be supported by substantial evidence.

-12-

the ALJ noted, Plaintiff was "feeling more alive" by March 2003 and by April 2003 Plaintiff was working on a business venture and tending to a plot of land in the community garden. (Tr. 24). Plaintiff's GAF score by December 2003 was listed as a 60, indicating moderate symptoms.[6]   It is true that the record shows that Plaintiff experiences some days that were more difficult than others and that she had problems dealing with a change in therapist and with dealing with her boyfriend.  However, the record also reveals that Plaintiff was able to appropriately use her medications, therapy, and other coping skills to handle these situations. (Tr. 272-94).

Furthermore, the ALJ detailed the opinions of the medical sources in the record regarding Plaintiff's mental limitations, which are discussed more fully below.  None of these doctors, including Dr. Chamberlain, believed that Plaintiff was unable to perform the limited range of sedentary work found by the ALJ.

The ALJ also took notice of Plaintiff's activities of daily living.  He noted, in part, that Plaintiff cooked, did laundry, performed yard work, visited with friends and family, drove a standard shift truck, went to town to have coffee with her friends, read, and did programming on the computer. (Tr. 26).  Plaintiff asserts that these abilities do not support the ALJ's

---

[6]      A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-Text Revision* at 34 ( *DSM-IV-TR* ), 30 (4th ed. 2000).  A GAF score of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships.  *Id.*

-13-

credibility determination because her cooking was limited to t.v. dinners, she learned computer programs but did not program them, she only went to get coffee at a local community store, and visits with friends was a skill she had learned to help cope with her depression. However, Plaintiff does not explain how her interpretation of her activities of daily living undermines the ALJ's credibility determination. The ability to perform the daily activities as documented by Plaintiff are not indicative of an individual who is unable to perform the limited range of sedentary work as described the ALJ.[7]

Plaintiff also argues that the ALJ failed to give controlling weight to the opinion of her treating physician, Dr. Chamberlain, regarding her mental limitations in accordance with 20 C.F.R. § 404.1527. Specifically, Plaintiff contends the ALJ failed to give proper weight to Dr. Chamberlain's opinion that Plaintiff had repeated episodes of decompensation and frequent problems with concentration, persistence, and pace.

Dr. Chamberlain did not opine that Plaintiff had "frequent" problems of concentration, persistence, and pace. Rather, she concluded that Plaintiff "often" had such difficulties. Furthermore, Dr. Chamberlain concluded Plaintiff did not have any restrictions of activities of daily living, had moderate difficulties in maintaining social functioning, and had repeated (three

_____

[7]     Furthermore, the record shows that Plaintiff's meals were not always t.v. dinners. (Tr. 88). The ALJ's statement that Plaintiff does programming on her computer is ambiguous. It does not necessarily indicate that he believed Plaintiff was capable of programming her computer especially in light of he ALJ's prior statement that Plaintiff learned programs on her computer. (Tr. 25).

or more) episodes of decompensation.   (Tr. 466).   The ALJ specifically discussed Dr.

Chamberlain's opinions.   Furthermore, he made findings that were consistent with Dr.

Chamberlain's opinion, as well as those of Dr. Brook and Dr. Kaul, in assessing whether

Plaintiff's impairments met or equally a listed impairment.   (Tr. 25, 26); *see* 20 C.F.R. §

404.1520a; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A.

Thereafter, the ALJ properly determined Plaintiff's RFC in light of these impairments.

(Tr. 25-27).   In doing so, the ALJ also adopted an RFC that was consistent with Dr.

Chamberlain's opinion. Dr. Chamberlain opined that Plaintiff's ability to function was seriously

limited, but not precluded, as to her use judgment, dealing with work stresses, maintaining

attention and concentration, and understanding, remembering, and carrying out complex job

instructions.   The ALJ determined that Plaintiff was limited to unskilled work with only 1, 2,

or 3 step instructions that did not require her to read, compute/calculate, problems solve, or

reason.   The ALJ also limited Plaintiff to work that involved minimum contact with and

minimum direction from a supervisor, no changes or adaptations more than once per month,

and only brief and superficial contact with the public.  (Tr. 26-27).

To the extent Plaintiff is alleging that the ALJ was required to incorporate the specific

language used by Dr. Chamberlain in assessing Plaintiff's limitations or to use the terms

"repeated episodes of decompensation" and "often has problems of concentration, persistence,

and pace", the Court sees no error.  The ALJ was not required to use any "talismanic" language

regarding Plaintiff's limitations when fashioning his RFC and subsequent hypothetical.  *See*

-15-

*Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). An ALJ's RFC assessment and corresponding hypothetical are sufficient if "[t]he ALJ went beyond [a] simple frequency assessment to develop a complete and accurate assessment of . . . [claimant's] mental impairment." *Id.* The RFC assessment is a highly individualized analysis dependent upon the facts of any given case. *Bohn-Morton v. Comm'r of Soc. Sec.*, 389 F. Supp. 2d 804, 807 (E.D. Mich. 2005).

In her reply brief, Plaintiff raises a new argument and asserts the ALJ committed error under Social Security Ruling ("SSR") 85-15, 1985 WL 56857, which instructs that "[t]he reaction to the demands of work (stress) is highly individualized," and that mentally impaired individuals "may have difficulty meeting the requirements of even so-called 'low-stress' jobs," and that "[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment." SSR at *6. Specifically, Plaintiff argues that the ALJ erred by not incorporating her poor ability to handle work stress as found by Dr. Chamberlain into his RFC finding.

However, it is not the function of a reply brief to raise issues for the first time but rather to respond to those arguments that have already been presented. *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993). Furthermore, it is not clear that SSR 85-15 has any application to this case because Plaintiff was found to have both exterional and non-exertional limitations. *See Doneworth v. Shalala*, 1996 WL 26922 *4 (6th Cir. 1996) (following *Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995).

-16-

Furthermore, there is no indication that the ALJ failed to follow the directive of SSR 85-15.  Rather, the record shows that the ALJ's assessment of Plaintiff's RFC included an individualized assessment of her stress as required by SSR 85-15.  He specifically found that her ability to perform unskilled, routine work was contingent upon finding work that did not require her to read, compute/calculate, problems solve, or reason and that involved only minimum contact with and minimum direction from supervisors, no changes or adaptations more than once per month, and brief and superficial contact with the public.  (Tr. 26-27).  These limitations reflected Plaintiff's impairments to the extent that the ALJ found them to be supported by evidence in the record.[8]

In her reply brief, Plaintiff also makes a passing argument that the ALJ improperly relied upon the Medical-Vocational Guidelines ("Guidelines") to support a finding of non-disability.  However, the ALJ's opinion clearly indicated that the ALJ properly used the Guidelines as only a framework for deciding that Plaintiff could perform a significant number of jobs in the national economy in spite of her limitations and that he ultimately relied upon the VE's testimony to support such a determination.  *See Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003); Tr. 28, 30).

---

[8]     Dr. Chamberlain's assessment indicates that she believed Plaintiff's primary difficulties derived from her inability to concentration.  (Tr. 467).

-17-

VI.   <u>**RECOMMENDATION**</u>

The Commissioner's decision is supported by substantial evidence.  Plaintiff's Motion for Summary Judgment (Docket # 19) should be **DENIED**.  Defendant's Motion for Summary Judgment (Docket # 22) should be **GRANTED** and the Plaintiff's complaint **DISMISSED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: January 30, 2007                              s/ Mona K. Majzoub
                                                      **MONA K. MAJZOUB**
                                                      **UNITED STATES MAGISTRATE JUDGE**

-18-

<u>PROOF OF SERVICE</u>

I hereby certify that a copy of this Report and Recommendation was served upon

Counsel of Record on this date.

Dated: January 30, 2007                    s/ Lisa C. Bartlett_____
                                           **Courtroom Deputy**